UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ROBERT MARGOLIES,

               Plaintiff,

     *v.*

JEN RUDOLPH a/k/a JENNIFER RUDOLPH and
THE ACTOR'S GREEN ROOM LLC,

              Defendants.

**MEMORANDUM &
ORDER**
21-CV-2447-SJB

**BULSARA, United States Magistrate Judge:**

Plaintiff Robert Margolies ("Margolies") filed this defamation action after

Defendant Jen Rudolph ("Rudolph") announced his removal from The Green Lounge, a

Facebook group she moderates, based on reports alleging that Margolies engaged in

sexual misconduct. Rudolph and co-defendant The Actor's Green Room LLC ("AGR")

have moved to dismiss the Amended Complaint on a variety of grounds.[1] For the

reasons outlined below, the motion to dismiss is granted.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purposes of this motion, the Court is "required to treat" the Amended

Complaint's "factual allegations as true, drawing all reasonable inferences in favor of

[Margolies] to the extent that the inferences are plausibly supported by allegations of

fact." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).[2] The

---

[1] Notice of Mot. to Dismiss Pl.'s Am. Compl. dated July 30, 2021, Dkt. No. 24 at 1;
Defs.' Mem. of Law in Supp. ("Mem.") dated July 30, 2021, Dkt. No. 24-2; Pl.'s Mem. of
Law in Opp'n ("Opp'n") dated Aug. 31, 2021, Dkt. No. 24-12; Defs.' Reply Mem. of Law
dated Sept. 10, 2021, Dkt. No. 24-16.

[2] Am. Compl. dated May 10, 2021 ("Am. Compl."), Dkt. No. 7.

Court "therefore recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the court, as we have no way of knowing at this stage what are the true facts." *Id.*

Margolies is a film producer, director, and acting coach who resides in Los Angeles, California.[3] He claims to be neither a politician nor celebrity.[4] Rudolph resides in Brooklyn, New York and is a casting director, acting coach, and founder and CEO of AGR.[5] AGR "connects various people in the entertainment industry."[6] It maintains a Facebook group called "The Green Lounge," which had more than 14,000 members as of May 10, 2021.[7] In April 2021, members posted 374 times in The Green Lounge.[8]

The Green Lounge's "Group Rules" contain a "ZERO TOLERANCE POLICY for sexual misconduct, harassment of any kind, defamation and insults surrounding race, religion, sexual orientation, gender or identity."[9] To that end, "[t]o maintain a safe, supportive, and inclusive environment solicitations of outside services/promotions, racial slurs, micro-aggressions, inappropriate sexual content, harassment of any kind, demeaning or defaming any member of this group is prohibited and will result in

---

[3] *Id.* ¶ 15.

[4] *Id.* ¶ 6.

[5] *Id.* ¶¶ 13, 16; *see also* Entity Information dated Apr. 29, 2021, attached as Ex. A to Am. Compl. at 1.

[6] Am. Compl. ¶ 16.

[7] *Id.* ¶ 17.

[8] The Green Lounge Facebook Page dated Apr. 30, 2021 ("The Green Lounge Facebook Page"), attached as Ex. B. to Am. Compl. at 3.

[9] *Id.*; Am. Compl. ¶ 19.

expulsion from the group."[10]  Any violations "must be flagged and reported and can result in expulsion."[11]

Margolies joined The Green Lounge on January 15, 2018.[12]  He used it for social and professional connections, including developing and maintaining relationships with clients and potential clients.[13]  He has been referred clients through The Green Lounge.[14]  As of June 2, 2020, the day before Rudolph's Facebook post that sits at the center of this litigation, Margolies had active business deals and contracts with several members of The Green Lounge community to provide services to them, their business partners, or their affiliates.[15]  These clients provided Margolies with annual revenues of more than $100,000, plus residual profits.[16]  In the two years prior to the filing of the Amended Complaint, Margolies claims he found an average of 10 clients per month from participating in The Green Lounge.[17]  And Rudolph knew Margolies had professional relationships with at least 100 other members of The Green Lounge who were his clients or considering becoming his clients.[18]  Margolies alleges that at the

---

[10] *Id.* ¶ 20; The Green Lounge Facebook Page at 2.

[11] *Id.* at 3; Am. Compl. ¶ 19.

[12] *Id.* ¶ 22.

[13] *Id.*

[14] *Id.*

[15] *Id.* ¶ 23.

[16] *Id.* ¶ 24.

[17] Am. Compl. ¶ 25.

[18] *Id.* ¶ 26.

beginning of June 2020, he "enjoyed a stellar professional reputation" in both The Green Lounge and the entertainment industry as a whole.[19]

On June 3, 2020, Rudolph posted a statement on The Green Lounge. Rudolph wrote:

> Over the past week, several women have bravely come forward, putting themselves on the line, to report that members of this community – [REDACTED] and Rob Margolies – crossed the line and caused them harm. I believe these women. I will always believe women and anyone who speaks up about sexual harassment, assault, and other abuses of power. These men have both been permanently removed from this group and will no longer be permitted to participate in any AGR activities, classes, events, or meetups. I realize that this action, and this statement has come far too late. For that and so much more, I am deeply sorry.[20]

(The "Facebook Post"). In a subsequent conversation thread, Rudolph added that a "second person I am aware of now has been removed."[21] Margolies alleges that this comment suggested that he "was also a perpetrator and/or predator who had engaged in inappropriate, sexual misconduct in the course of professional interactions, thus ostracizing [him] from his professional contacts and colleagues."[22]

Margolies claims that Rudolph removed him from The Green Lounge without investigating whether he violated the Zero Tolerance Policy or giving him a chance to address the allegations.[23] According to Margolies, in doing so Rudolph further

---

[19] *Id.* ¶ 27.

[20] *Id.* ¶¶ 28–29; Undated Facebook Post (the "Facebook Post"), attached as Ex. C to Am. Compl.

[21] Undated The Green Lounge Facebook Thread, attached as Ex. D to Am. Compl. at 6; Am. Compl. ¶ 30.

[22] *Id.*

[23] *Id.* ¶ 31.

communicated to The Green Lounge community that he engaged in "sexual harassment, assault, and/or other abuses of power."[24] Rudolph's Facebook Post thus damaged Margolies's business interests—since the Post, "he has received no referrals via [The Green Lounge] and has lost business opportunities and existing projects."[25]

Margolies sets forth five claims in the Amended Complaint. Count I is for defamation *per se*.[26] In Count II, Margolies alleges that Defendants caused intentional infliction of emotional distress,[27] and Count III is a claim for negligent infliction of emotional distress.[28] Count IV, for tortious interference with contractual relations, is based on contracts Margolies claims that he had with two entities, which Defendants knew of.[29] And Count V is for injurious falsehood.[30] Margolies seeks actual and punitive damages and attorney's fees.[31]

DISCUSSION

"The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of . . . claims for relief." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018) (citing *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir.

---

[24] *Id.*

[25] *Id.* ¶ 33.

[26] *Id.* ¶¶ 34–46.

[27] Am. Compl. ¶¶ 47–52.

[28] *Id.* ¶¶ 53–58.

[29] *Id.* ¶¶ 59–67.

[30] *Id.* ¶¶ 68–77.

[31] *Id.* Prayer for Relief at 13–15.

2007)).  In deciding such a motion, the Court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quotations and alteration omitted)*; Amadei*, 348 F. Supp. 3d at 155 ("[W]hen reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of [the non-moving party].").

Once the facts are construed in the light most favorable to the non-moving party—here, Margolies—to avoid dismissal there must be sufficient facts that allege a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (internal citation and quotations omitted). "[A] district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.  Of course, it may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  A complaint must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.* (citation and quotations omitted).  In other words, a plausible claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; Fed. R. Civ. P. 8(a)(2).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that

all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (internal citations omitted). The determination of whether a party has alleged a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Escamilla v. Young Shing Trading* Co., No. 17-CV-652, 2018 WL 1521858, at \*2 (E.D.N.Y. Jan. 8, 2018), *report and recommendation adopted*, 2018 WL 1033249, at \*3 (Feb. 23, 2018).[32]

Each of the claims is analyzed below in turn.

I.   Defamation

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (quoting *Hogan v. Herald Co.*, 84 A.D.2d 470, 474, (4th Dep't 1982)). "Generally, spoken defamatory words are slander; written defamatory words are libel." *Id.* "Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third

---

[32] Margolies first sued Rudolph in the Superior Court of California. Compl., *Margolies v. Walsh*, No. 20STCV24913 (Cal. Sup. Ct. July 2, 2020). Although that action was dismissed with prejudice, prompting Defendants to seek dismissal of this litigation on the basis of res judicata and collateral estoppel, Mem. at 6–8, the dismissal was later stricken. *See* Min. Order, *Margolies v. Walsh*, No. 20STCV24913 (Cal. Sup. Ct. Oct. 21, 2021) ("The Motion to Strike (not initial pleading) Dismissal with Prejudice entered on May 3, 2021 (Res ID: 8731) filed by Robert Margolies on 08/31/2021 is Granted. The Request for Dismissal filed by Robert Margolies on 05/03/2021 is ordered stricken."). And without a with-prejudice dismissal, there is no resolution on the merits, and as such, no collateral estoppel or res judicata bar to the present lawsuit. *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 445 (2d Cir. 2022) ("[A] dismissal without prejudice . . . does not preclude another action on the same claims, whereas a dismissal with prejudice is a ruling on the merits that precludes a plaintiff from relitigating – in any court, ever again – any claim encompassed by the suit[.]") (internal citations and quotations omitted).

party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability."[33] *Palin*, 940 F.3d at 809.[34] "In addition, a public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is made with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* (quotations omitted).

As explained below, Margolies does not state a defamation claim because he fails to plead actual malice and falsity.[35]

A.    Written Defamatory Statement of and Concerning the Plaintiff

As to the first element, Margolies must plead the existence of a defamatory statement. "[A] defamatory statement [is] one that exposes an individual to public

---

[33] "[F]our types of statements are per se actionable under New York law: those that imput[e] unchastity to a woman, assert that a plaintiff has a loathsome disease, tend to injure him in his profession, or charge a plaintiff with a serious crime." *Oakley v. Dolan*, 833 F. App'x 896, 900 (2d Cir. 2020) (second alteration in original) (quotations omitted).  Defendants do not argue that Margolies fails to plead *per se* defamation.

[34] The parties rely on New York tort law without explaining their choice.  As a result, and in the absence of any identifiable public policy to the contrary, the Court applies New York law.  *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984) ("[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied."); *e.g.*, *Blodgett v. Siemens Indus., Inc.*, No. 13-CV-3194, 2018 WL 385477, at *5 (E.D.N.Y. Jan. 11, 2018) ("Plaintiffs' . . . citation solely to New York law in support of their . . . claims in their prior submissions is deemed by this Court to constitute an implied consent to use New York law, which settles the choice of law issue in favor of the application of New York law.").

[35] Defendants quote *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, for the proposition that "New York courts have consistently protected statements made in online forums as statements of opinion rather than fact."  151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015) (Bianco, J.), *aff'd*, 670 F. App'x 731 (2d Cir. 2016).  But they ignore the relevant context that follows: "Obviously, these aforementioned cases do not stand for the proposition that no comments posted on an online forum can ever be found to be defamatory."  *Id.*  And as explained herein, the Facebook Post could be deemed defamatory.

hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society." *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005) (quotations and alterations omitted). "Under New York law, (with some exceptions) statements that do not purport to convey *facts* about the plaintiff, but rather express certain kinds of *opinions* of the speaker, do not constitute defamation." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 110 (2d Cir. 2017) (emphasis in original) (quoting *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 202 (2d Cir. 2015)); *Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014) ("[O]nly factual statements are actionable as defamation or libel."); *see also Wexler v. Dorsey & Whitney LLP*, 815 F. App'x 618, 621 (2d Cir. 2020) ("Since falsity is a *sine qua non* of a libel claim and since only assertions of fact are capable of being proven false, we have consistently held that a libel action cannot be maintained unless it is premised on published assertions of *fact*.") (emphasis in original) (quoting *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995)).

In determining whether a statement is a factual assertion—as opposed to a nonactionable opinion—a court examines three factors:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Elias*, 872 F.3d at 110 (alterations in original) (quoting *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153 (1993)). "[T]he 'essential task is to decide whether the words complained of, considered in the context of the entire communication and of the

circumstances in which they were . . . written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion.'" *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) (quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986)). "When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact." *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997).[36]

The Facebook Post, plainly and simply, is Rudolph saying that several women have told her that Margolies caused them harm, either by sexually harassing or assaulting them or through "other abuses of power." This is a statement of fact. *See, e.g.*, *Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 152 (S.D.N.Y. 2016) ("Sexual assault of a minor is a clear-cut issue; either transgression occurred or it did not. . . . The issue is not a matter of opinion, and there cannot be differing understandings of the same facts that justify diametrically opposed opinion as to whether Defendant was involved in Plaintiff's abuse . . . . Either Plaintiff is telling the truth about her story and Defendant's involvement, or Defendant is telling the truth and she was not involved in the trafficking and ultimate abuse of Plaintiff. The answer depends on facts. Defendant's statements are therefore actionable as defamation.").

To suggest this is an "opinion" as opposed to an alleged fact, Defendants advance a series of meritless arguments. They suggest that the statement that Margolies

---

[36] "Even if a statement is deemed to be opinion, there may be liability for defamation where there is 'a clear but false implication that the author is privy to facts about the person that are unknown to the general reader.'" *Wexler*, 815 F. App'x at 622 (quoting *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 225 (2d Cir. 1985)); *see also Levin*, 119 F.3d at 197 ("[H]ypothesis or conjecture . . . may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader.").

"crossed the line" and "caused . . . harm" is vague and imprecise. This argument focuses too narrowly on assorted phrases in the Facebook Post, robbing them of the appropriate context in the surrounding sentences. This "Court considers the import of the post[] holistically, without attempting to artificially disentangle fact from opinion." *Moraes v. White*, No. 21 Civ. 4743, 2021 WL 5450604, at *11 (S.D.N.Y. Nov. 22, 2021). "At bottom, the inquiry is whether a reasonable listener is likely to have understood the statements as conveying provable facts about the plaintiff." *Torain v. Liu*, 279 F. App'x 46, 46 (2d Cir. 2008). Under that standard, the Facebook Post has a capable and precise meaning: that Rudolph was informed by multiple women that Margolies and one other person committed assault or harassment or something similar. (Indeed, it is because the meaning is precise that Margolies is permanently removed from The Green Lounge and multiple commenters want to know the identity of the accusers.) The meaning of "crossing the line" is readily apparent from the latter portion of the Post, where Rudolph gives examples: "sexual harassment, assault, and other abuses of power." And there is nothing imprecise, as Defendants argue, about Rudolph's statement "I believe these women." The statement could not be clearer—she believes the accounts that she has been told.

Defendants' reliance on *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, is misplaced. There, the speaker's assertion—"There are things I've been prohibited from sharing with you . . . that have included varying degrees of what many people might view as extortion, manipulation, fraud, and deceit . . . *by someone I know. And someone you know, too.*"—was found not actionable. 230 F. Supp. 3d 209, 311 (S.D.N.Y. 2017). In *Moxie*, the Court concluded that the statement was not defamatory because it was not about the plaintiff—the ambiguous "by someone I know" made the statement not

actionable.  *Id.* ("SBBI has provided no evidence to support the conclusion that an average reader would understand that this statement was a reference to Rodgers.").  The court also concluded the post was not defamatory because it was hyperbolic: the "tone and apparent purpose" of the statement "ma[de] it clear that this is not an accusation of a criminal offense, but the use of colorful language to describe her high level of frustration."  *Id.* at 313.  The qualifying language "varying degrees of what many people might view" also added ambiguity about what was intended.  *Id.*  As in all defamation cases, context matters.  Indeed, the Court in *Moxie* cautioned that "[o]bviously an accusation of blackmail could be defamatory in another context.  So could an accusation that an individual engaged in 'fraud' or 'extortion.'"  *Id.*  The uncertainty present in *Moxie* is not here.  Nor is there any sense of hyperbole.  The purpose of the Facebook Post was to relay allegations of sexual harassment and sexual assault against Margolies, Rudolph's belief in them, and justify Rudolph's decision to remove Margolies from The Green Lounge.

Defendants also contend that the "crossing the line" and causing "harm" allegations could neither be proven true nor false and are therefore not actionable.  But this again ignores what Rudolph states later, namely that Margolies has engaged in sexual assault, harassment, or something similar.  Shoring the terms "something similar," "crossing the line," or causing "harm" from the allegations of assault and harassment would potentially make the allegations inactionable.  But that elides the core claim of the Facebook Post.  And the core allegation is a provable fact.  Whether several women came forward to report that Margolies caused harm in the form of sexual harassment, assault, or other ways can be proven true or false.  The women either made those reports or they did not.  Although "harm" and "cross[ing] the line" may be

subjective in other contexts, the statement here is clear that what is meant is sexual harassment or sexual assault.

Defendants also contend that the broader context would lead the average reader to consider the Facebook Post as opinion, not fact. Not so. They contend that the "average reader" would read the Facebook Post as explaining "why she ousted the two men in light of current affairs, not whether or not they were actually sexual predators." (Mem. at 17). It is unclear what this argument achieves. If the Facebook Post reflects that Rudolph ousted Margolies "in light of current affairs," it does not make the statement any less factual. And to read the Facebook Post as something other than reporting an accusation of sexual harassment and assault is implausible.[37]

As to whether Rudolph's Facebook Post was "of and concerning him," Margolies "need only plead sufficient facts to make it plausible—not probable or even reasonably likely—that a reader familiar with [the plaintiff] would identify [the plaintiff] as the subject of the statements at issue." *Palin*, 940 F.3d at 816 (alterations in original) (quotations omitted). "[T]he bar to satisfy this element is low." *Id.* Because the Facebook Post referred to Margolies using his full name, it is "of and concerning" him. *E.g.*, *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 180 (S.D.N.Y. 2021) (ruling statement in internet article that "identified [plaintiff] by name" actionable), *appeal dismissed*, No. 21-491 (2d Cir. Apr. 16, 2021).

---

[37] Defendants' argument and citation to *Kasavana v. Vela*, 172 A.D.3d 1042 (2d Dep't 2019), a case that found statements actionable, suffers from a common logical flaw. That a court found potentially more egregious facts sufficient to satisfy a legal standard says nothing about whether the facts here are sufficient. *Kasavana* does not purport to set a legal floor of facts necessary to state a defamation claim.

B. <u>Publication to a Third Party</u>

Defendants acknowledge that the Facebook Post was shared with third parties, *i.e.*, the other members of The Green Lounge. (Mem. at 23 n.11 ("[D]efendants published the Statement to all of [The Green Lounge]")). The publication element is therefore satisfied.

C. <u>Degree of Fault</u>

"[T]he showing of fault necessary to recover for libel varies depending on a plaintiff's position in society, requiring a higher degree of fault for public officials and public figures." *Celle*, 209 F.3d at 176. "Limited-purpose public figures who seek damages for defamatory statements must show that the statements were made with 'actual malice'—that is, with knowledge that the statements were false or with reckless disregard as to their falsity." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015); *see also BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 818 (S.D.N.Y. 2021) (Nathan, J.), *aff'd*, No. 21-1097, 2022 WL 598973, at *4 (2d Cir. Mar. 1, 2022). Defendants do not contend that Margolies is such a figure. However, they argue that because of New York's anti-SLAPP ("Strategic Lawsuits Against Public Participation") statute, he is required to plead actual malice.

The New York anti-SLAPP law expands the category of claims that must plead actual malice. Pursuant to the law, any action "involving public petition and participation," including one based on "any communication in a place open to the public or a public forum in connection with an issue of public interest,"[38] must plead actual

---

[38] Although these provisions were enacted after Rudolph's Facebook Post was made, Margolies does not dispute that the current anti-SLAPP law applies to his defamation claim. *See* Opp'n at 17–21.

malice to recover damages.  N.Y. Civ. Rights Law § 76-a(1)(a)(1)–(2).  Defendants

contend that the Facebook Post is such a communication, and therefore Margolies is

required to plead actual malice to recover damages for defamation.  (Mem. at 8–12).

The Court agrees.

Margolies argues that The Green Lounge, as a closed group, is not "a place open

to the public or a public forum," and the anti-SLAPP law does not apply.  (Opp'n at 21).

The argument is without merit.[39]  (And rather ironic, because elsewhere he contends

that his personal and professional reputations were harmed precisely because of the

broad reach of The Green Lounge.  *E.g.*, *id.* at 14 ("[Rudolph] nonetheless published the

false statement to the more than 13,000 members . . . Plaintiff suffered economic loss in

that he lost business opportunities and business relations with the many members[.]")).

The group, although "closed" because its content is not generally available online to

non-members and members must be admitted, is a public forum.  The group has over

14,000 members.  Besides its vast membership, The Green Lounge has the character of

"a place open to the public," because it has no meaningful barriers to entry—to join one

need only agree to the rules of the group—and its members appear to be free to speak

online about any subject openly.  *See* Am. Compl. ¶ 18 ("The Green Lounge Facebook

group is a place for actors from all over the world can come to realize their dreams in the

community.  We provide education, connection, and individual/industry support for all

of our members."); *id.* ¶ 19 ("To join and participate in the Group, members agree . . . to

honor the . . . rules[.]"); *id.* ¶ 21 ("We encourage all types of conversations and foster an

---

[39] Margolies does not dispute that the Facebook Post is a matter of public interest.  Nor could he, given the broad reach the statute provides for the term: "'Public interest' shall be construed broadly, and shall mean any subject other than a purely private matter."  § 76-a(1)(d).

open, receptive atmosphere.") (quoting The Green Lounge Facebook Page at 3); *cf. Reno v. ACLU*, 521 U.S. 844, 863 n.30 (1997) ("First, the Internet presents very low barriers to entry.  Second, these barriers to entry are identical for both speakers and listeners.  Third, as a result of these low barriers, astoundingly diverse content is available on the Internet.  Fourth, the Internet provides significant access to all who wish to speak in the medium, and even creates a relative parity among speakers.") (quoting *ACLU v. Reno*, 929 F. Supp. 824, 877 (E.D. Pa. 1996)); *Kosor v. Olympia Companies, LLC*, 478 P.3d 390, 397 (Nev. 2020) ("While printouts of certain Nextdoor.com pages in the record suggest that parties must enter their name and address in order to view website posts—that is, that Kosor's post might not have been entirely, freely accessible to every member of the public without any limitation—these steps do not seem to differ significantly from that which might be required to view posts on Facebook; that is, a post on Nextdoor.com is as compatible with expressive activity as one on the other platform, which we have already held can support a public forum.").[40]

Because the defamation claim falls within the anti-SLAPP statute, Margolies was required to plead that Rudolph acted with actual malice.  He has not done so, and this claim, therefore, must be dismissed.

Actual malice must be plausibly alleged.  *Biro*, 807 F.3d at 546.  "[W]hether actual malice can plausibly be inferred will depend on the facts and circumstances of each case."  *Id.*  Margolies alleges that Rudolph made the Facebook Post "without corroborating evidence or a means of assessing the credibility of the claimants," and "without conducting any investigation"; that the Post was "intentionally misleading";

---

[40] To the extent that there are any barriers to entry, other than agreeing to abide by the terms and conditions, Margolies does not identify them.

and that the Post was "malicious in nature, . . . [made] solely to damage Plaintiff's reputation and career." (Am. Compl. ¶¶ 3, 4, 7, 31). These allegations and the other identical conclusory allegations, (*id.* ¶¶ 35, 37), do not support a plausible inference of actual malice. "[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice[.]" *Biro*, 807 F.3d at 546. However, the allegations must be non-conclusory, because the mere failure to investigate "does not in itself establish bad faith." *St. Amant v. Thompson*, 390 U.S. 727, 733 (1968). Alleging that Rudolph failed to investigate the allegations, obtain corroboration, or conduct further investigation is a conclusory assertion; it does not provide any facts on which to infer that Rudolph made the Facebook Post either with knowledge that the allegations against Margolies were false or in reckless disregard of their falsity. *Contemp. Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988) ("[A] finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing. . . . Rather, a public figure defamation plaintiff must show either that the publisher actually entertained serious doubts about the veracity of the publication, or that there are *obvious* reasons to doubt the veracity of the informant or the accuracy of his reports.") (alterations in original) (quotations omitted); *see, e.g.*, *BYD Co. Ltd.*, 531 F. Supp. 3d at 826 ("[N]one of these allegations, even read with all inferences drawn in [plaintiff's] favor, plausibly establish that [defendant] recklessly disregarded the truth in reporting, as none come close to plausibly alleging that anyone at [defendant] was subjectively aware that the source was unreliable.") (quotations omitted); *Cabello-Rondón v. Dow Jones & Co., Inc.*, No. 16-CV-3346, 2017 WL 3531551, at *9 (S.D.N.Y. Aug. 16, 2017) (finding conclusory allegation of failure to investigate before publishing is

not sufficient to establish actual malice), *aff'd*, 720 F. App'x 87, 89 (2d Cir. 2018). And merely denying in conclusory fashion that he engaged in the alleged conduct is not enough. *Brimelow v. New York Times Co.*, No. 21-66-CV, 2021 WL 4901969, at *3 (2d Cir. Oct. 21, 2021).[41]

Margolies, apparently aware of the deficiencies in the Amended Complaint, asks the Court to rely upon and consider his affidavits (and those submitted by Defendants). (Opp'n at 19–21). In evaluating whether a plaintiff has stated a claim, the Court does not and cannot consider any documents other than the pleadings and exhibits attached thereto. *Kramer*, 937 F.2d at 773 ("In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."). And a plaintiff may not amend his complaint by affidavit in response to a motion to dismiss. *Colliton v. Bunt*, No. 15-CV-6580, 2016 WL 7443171, at *5 (S.D.N.Y. Dec. 27, 2016) ("Courts ordinarily do not consider factual assertions contained in affidavits submitted in support of or opposition to a motion to dismiss. Moreover, a plaintiff generally may not amend its complaint through its opposition to a motion to dismiss.") (internal citation omitted), *aff'd*, 709 F.

---

[41] The parties spend significant time discussing the import of *Coleman v. Grand*, 523 F. Supp. 3d 244 (E.D.N.Y. Feb. 26, 2021). The case is on appeal and therefore does not impact the Court's analysis.

App'x 82, 84 (2d Cir. 2018).[42]  Having failed to plead actual malice, as the New York anti-SLAPP statute requires, the defamation claim must be dismissed.

\*　　　　\*　　　　\*　　　　\*

Both sides confuse the applicability of New York's anti-SLAPP statute in federal court.  Some clarification is warranted.

Margolies asserts that "courts are split" on whether anti-SLAPP statutes apply in federal court.  (Opp'n at 17–18).  This misapprehends the law.  Certain provisions of anti-SLAPP laws that conflict with the Federal Rules of Civil Procedure are invalid in federal court.  *La Liberte v. Reid*, 966 F.3d 79, 86 (2d Cir. 2020).  *Erie* requires a federal court in a diversity action to apply state substantive and federal law of procedure.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Nonetheless, a federal court may apply state procedure if there is no applicable federal rule of procedure; alternatively, if there is an applicable federal rule, it must be applied unless the rule runs afoul of the Rules Enabling Act.  "A federal court exercising diversity jurisdiction should not apply a state law or rule if (1) a Federal Rule of Civil Procedure 'answer[s] the same question' as the state law or rule and (2) the Federal Rule does not violate the Rules Enabling Act."  *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015) (alteration in original) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–99 (2010)); *see also Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941).  For instance, certain anti-SLAPP laws permit a defamation defendant to file a special

---

[42] The additional affidavits (and associated briefings) submitted by both sides set forth factual narratives that are almost impossible to follow.  They refer to non-party individuals, events, and interactions in an inside baseball fashion (using unclear and different pronouns to refer to the same individuals).  Even if the Court were inclined to untangle the affidavits, it would be hard pressed to do so cogently.

motion to strike—which imposes more stringent pleading standards than required by Federal Rules of Civil Procedure 8 and 12—and require dismissal of a claim when the Federal Rules would not.  *E.g.*, Cal. Civ. Proc. Code § 425.16(b)(1); *La Liberte,* 966 F.3d at 87 ("The [California] statute thus 'establishes the circumstances under which a court must dismiss a plaintiff's claim before trial,' a question that is already answered (differently) by Federal Rules 12 and 56.") (quoting *Abbas*, 783 F.3d at 1333–34).  As such, some courts have found that such anti-SLAPP provisions, when applied in federal court, conflict with the Federal Rules of Civil Procedure.  *Id.* at 86.  Because no Federal Rule of Civil Procedure has ever been found to violate the Rules Enabling Act, these courts have concluded that the anti-SLAPP special motion to strike cannot be used in federal court.  *Id.* at 88.  Other federal courts have found that the special motion can exist alongside Rules 12 and 56.  *See, e.g.*, *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021) ("Although portions of the California anti-SLAPP statute are inapplicable in federal court, we have held that 'there is no direct collision' between the special motion to strike subsection of the statute and the Federal Rules[.]") (internal citations omitted) (quoting *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972 (9th Cir. 1999)).

But that "circuit split" has nothing to do with this case.  Provisions of an anti-SLAPP law that do not conflict with any federal rule or law—such as provisions that change the elements of a defamation claims—may be applied in federal court.  *E.g.*, *Adelson v. Harris*, 973 F. Supp. 2d 467, 500–01 (S.D.N.Y. 2013) (applying fee-shifting provision of Nevada anti-SLAPP law), *aff'd*, 876 F.3d 413, 415 (2d Cir. 2017).  And, as relevant here, the provisions of New York's anti-SLAPP law that expand the categories

of claims that must plead actual malice apply in federal court because they do not conflict with any Federal Rule of Civil Procedure.

Defendants, for their part, cite to the evidentiary provisions of the anti-SLAPP law to argue the statute permits this Court to consider extrinsic evidence on a motion to dismiss. They cite to "§ 70(a) and § 76(a)," (Mem. at 3 n.2, 24), but neither are provisions of the anti-SLAPP law, and indeed such provisions are non-existent. (The amendments to the anti-SLAPP law appear at section 76-a; the ability to bring an affirmative anti-SLAPP suit is codified at section 70-a. Neither addresses judicial notice or the rules of evidence. *See* N.Y. Civ. Rights Law §§ 70-a, 76-a.) But any such provision requiring the Court to take judicial notice or altering the rules of evidence arguably conflicts with the Federal Rules of Evidence and therefore is also potentially invalid.

The preceding *Erie* analysis applies to some—but not all—conflicts between state and federal rules of evidence. A state rule of evidence can implicate substantive or procedural goals. *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 883 (10th Cir. 2006) ("[W]e can distinguish a substantive rule from a procedural rule by examining the language and the policy of the rule in question. If these inquiries point to achieving fair, accurate, and efficient resolutions of disputes, the rule is procedural. If, however, the primary objective is directed to influencing conduct through legal incentives, the rule is substantive."). Pursuant to *Erie*, a federal court may apply a state rule of evidence that is substantive. *E.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543, 2017 WL 2493143, at *2 (S.D.N.Y. June 9, 2017) ("It follows that the [Arizona] rule applies in this case and precludes New GM from using evidence of Ward's citation and admission of responsibility to prove his negligence.").

On the other hand, if the evidentiary rule is procedural, it may be applied if there is no applicable or equivalent Federal Rule of Evidence. If there is an equivalent rule, therein comes a twist. The Federal Rules of Evidence were originally enacted by Congress; thereafter, new rules and amendments were approved by the Supreme Court pursuant to its authority under the Rules Enabling Act. If the state rule of evidence conflicts with a Federal Rule of Evidence created pursuant to the amendment process, then the court applies the *Erie* conflict test in *Shady Grove* and *Sibbach*. In contrast, a conflict between a state procedural rule and an original Federal Rule of Evidence is a Supremacy Clause question (because the original Federal Rules of Evidence were a Congressional enactment). *See generally Sims*, 469 F.3d at 879. That analysis is governed by *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 (1988) ("[A] district court sitting in diversity must apply a federal statute that controls the issue before the court and that represents a valid exercise of Congress' constitutional powers."). Since no court has concluded that the original Federal Rules of Evidence were not a valid exercise of Congressional authority, the Supremacy Clause analysis will inexorably result in the application of the federal rule over the state procedural rule of evidence. *United States v. Lowery*, 166 F.3d 1119, 1125 (11th Cir. 1999) ("When it comes to the admissibility of evidence in federal court, the federal interest in enforcement of federal law, including federal evidentiary rules, is paramount. State rules . . . on any subject, cannot trump the Federal Rules of Evidence."); *Hogan v. Novartis Pharms. Corp.*, No. 06 Civ. 0260, 2011 WL 1336566, at *2 (E.D.N.Y. Apr. 6, 2011) ("[F]or the federal rule not to apply, she must show that it cannot be rationally classified as procedural."). A similar result is likely to flow from a conflict between a state procedural rule of evidence

and a Federal Rule of Evidence promulgated by the Supreme Court, because it has also never found any evidence rule to run afoul of the Rules Enabling Act.

Resolution of the present motion does not require the Court to engage in this complicated analysis in determining the applicability of evidentiary provisions of the New York anti-SLAPP statute, because Defendants have not actually or correctly identified any such provision. But both sides' general statements and citations to the anti-SLAPP law fail to apprehend the correct legal framework.

D. <u>Falsity</u>

Even if Margolies had pled actual malice, he fails to plead falsity. "'Substantial truth' is the standard by which New York law, and the law of most other jurisdictions, determines an allegedly defamatory statement to be true or false." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017). To plead falsity—to "allege that the complained of statement is 'substantially false[,]'" *id.* (quoting *Franklin v. Daily Holdings Inc.*, 135 A.D.3d 87, 94 (1st Dep't 2015))—a plaintiff "must identify *how* the defendant's statement was false to survive a motion to dismiss." *Id.* at 245 (emphasis added). That is, a plaintiff has "to plead facts that, if proven, would allow a reasonable person to consider the statement false[,]" *i.e.*, "facts that, if proven, would establish that the defendant's statements were not substantially true." *Id.* at 247.

Margolies, in his Complaint, alleges repeatedly that the Facebook Post is "false." (*E.g.*, Am. Compl. ¶¶ 1–4, 33, 35). Some form of the word "false" appears 29 times in the Amended Complaint. The allegations of falsity are often shorthand for being unsubstantiated. (*Id.* ¶ 2 ("The wholly unsubstantiated allegations . . . . contained numerous false statements[.]")). At other points Margolies says that the Facebook Post

contains false information and "untrue statements alleging Plaintiff engaged in sexual misconduct, namely sexual harassment and assault." (*Id.* ¶ 3).

This is not enough to allege falsity in a defamation suit. These are conclusory statements, and not facts from which any inferences could be drawn. (*See id.* ¶ 37 (referring to "false statements"); *id.* ¶ 41 (referring to "false publications")). He does not identify which portion of the Facebook post is allegedly false, or why the statement is false. This is not enough to "identify . . . the respect in which [the statement] was allegedly false." *Tannerite Sports*, *LLC* 864 F.3d at 251; *Primiani v. Vintage 185 Inc.*, No. 18-CV-2237, 2019 WL 486087, at *3 (E.D.N.Y. Feb. 6, 2019) (holding that "general allegations of falsity" without "any additional context or details" are merely "vague assertions" insufficient to plead falsity) (collecting cases); *e.g.*, *Cabello-Rondón*, 2017 WL 3531551, at *6 ("[T]his conclusory and convoluted statement is insufficient as a matter of law. To plausibly plead falsity, Cabello must do more than perfunctorily state that a statement is false[.]").

Having failed to plead either actual malice or falsity, Margolies has failed to state a defamation claim.

II.     Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress under New York law, a plaintiff must show "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019) (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)).

Margolies fails to allege the existence of "extreme and outrageous" conduct. "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996). Such conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Truman v. Brown*, 434 F. Supp. 3d 100, 117 (S.D.N.Y. 2020) (quoting *Chanko v. Am. Broadcasting Cos.*, 27 N.Y.3d 46, 56 (2016)); *Levin v. Am. Document Servs., LLC*, 828 F. App'x 788, 792–93 (2d Cir. 2020) (same). "[F]alse accusations of criminal conduct, or conduct that society deems reprehensible, do not inherently establish" extreme and outrageous conduct. *Truman*, 434 F. Supp. 3d at 119.

Margolies alleges that Defendants "intentionally defamed" him and "intentionally inflicted emotional harm by publishing the unsubstantiated allegations," which were "were so outrageous and utterly intolerable that they caused mental anguish and severe psychological and emotional distress[.]" (Am. Compl. ¶¶ 48, 50). Margolies does not cite to any court that has found false allegations of sexual misconduct to constitute extreme and outrageous conduct. Indeed, the cases run in the opposite direction, rejecting the argument. *E.g.*, *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 375 (S.D.N.Y. 2016) (dismissing claim against university for handling of allegation that plaintiff raped a student because even if the allegation was false, the university's conduct was not extreme and outrageous). And his conclusory allegations that the conduct was extreme and outrageous do not provide any basis to make that inferential leap.

Margolies also fails to satisfy the fourth element, namely that he suffered severe emotional distress. Margolies's conclusory allegation that he suffered "mental anguish

and severe psychological and emotional distress," (Am. Compl. ¶ 50), is facially insufficient to sustain the claim. *E.g.*, *Taylor v. Quayyum*, No. 16-CV-1143, 2021 WL 6065743, at *9 (S.D.N.Y. Dec. 21, 2021) ("Nor has Plaintiff pleaded that he actually experienced severe emotional distress. Plaintiff's only reference to emotional distress is the broad assertion that he suffered 'mental anguish.' This lone and conclusory allegation is insufficient to plead severe emotional distress.") (internal citation omitted); *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 490 (S.D.N.Y. 2013) (dismissing intentional infliction of emotional distress claim where "[t]he Amended Complaint [did] not make any non-conclusory allegation that [plaintiff] suffered severe emotional distress").

III.    Negligent Infliction of Emotional Distress

"Under New York law, a plaintiff can establish a claim for negligent infliction of emotional distress if [his] injuries arise out of one of three theories: (i) the bystander theory, (ii) the 'zone of danger' theory, or (iii) the direct duty theory." *Doe v. Doe*, No. 16 CIV. 0332, 2017 WL 3025885, at *8 (S.D.N.Y. July 14, 2017). Margolies is proceeding under the direct duty theory. (Opp'n at 12). To state a claim for negligent infliction of emotional distress under that theory, "a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021).

The claim fails on the first element. "The duty . . . must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). The Amended Complaint contains no allegation that Defendants owed Margolies any duty. Margolies argues that Rudolph

had a duty "to protect the members from defamation and harassment of any kind – as is stated in the Facebook group's rules[,]" (Opp'n at 12), but since it is not alleged in the pleading, it is entitled to no credit. *Soules v. Connecticut Dep't of Emergency Servs. & Pub. Prot.*, 882 F.3d 52, 56 (2d Cir. 2018) ("[P]arties may not amend the pleadings through motion papers."). And even if the allegation were in the Amended Complaint, nothing about the Facebook group's rules of conduct creates a duty from Rudolph to Margolies (either specifically or generally) under any precedent the Court is aware of (and Margolies cites none). *See generally Lancellotti v. Howard*, 155 A.D. 588, 589–90 (4th Dep't 1989) ("[A] cause of action seeking such recovery must generally be premised upon a breach of a duty owed directly to the plaintiff *which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety*[.]") (emphasis added); *Johnson v. City of New York*, No. 16-CV-6426, 2018 WL 1597393, at *23 (E.D.N.Y. Mar. 31, 2018) (same). But even if such a duty is inferable, Margolies has not pled any facts to suggests that Rudolph violated the Facebook group's rules, *i.e.*, that there was a breach of the duty. Indeed, by failing to allege that the Facebook Post is false, *supra* at 23–24, it is impossible to infer that the Post violated the group's rules.

Absent identification of a legally cognizable duty or a breach of such a duty, the claim must be dismissed. *E.g.*, *Abdulaziz v McKinsey & Co., Inc.*, No. 21 Civ. 1219, 2021 WL 4340405, at *4 (S.D.N.Y. Sept. 22, 2021) (granting motion to dismiss negligence infliction of emotional distress claim where the complaint failed to allege breach of "any legally cognizable duty of care"); *Truman*, 434 F. Supp. 3d at 123 (dismissing claim where the complaint did "not allege that [defendant] had a specific duty to [plaintiff], or that he unreasonably endangered her physical safety"); *Druschke v. Banana Republic,*

*Inc.*, 359 F. Supp. 2d 308, 315 (S.D.N.Y. 2005) (dismissing claim where plaintiff "failed to allege that Banana Republic owed any 'direct duty' towards her that could give rise to a special obligation to avoid negligently causing her emotional distress").

IV.    Tortious Interference with Contractual Relations[43]

To state a claim for tortious interference with contractual relations under New York law, a plaintiff must plead "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (quotations omitted).

Margolies fails to satisfy the second element—that Defendants had knowledge of the contracts. "Although a defendant need not be aware of all the details of a contract, it must have actual knowledge of the specific contract." *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012) (quotations omitted). Margolies alleges that he had contracts with "One on One NYC and Next Level Studios LA[.]" (Am. Compl. ¶ 60). Both contractual arrangements involved other members of The Green Lounge community, and Margolies alleges Defendants were generally aware of such relationships formed in the group. (*See id.* ¶¶ 61–62). These are not allegations that Defendants were aware of specific contracts, and are insufficient to state a claim. *Plasticware, LLC*, 852 F. Supp. 2d at 404 ("Plaintiff has not sufficiently alleged that Defendant knew of these contracts, only that Plaintiff told Defendant that the cancelled

---

[43] Margolies's opposition brief contains a single reference to tortious interference with "business relations." Opp'n at 12. Because the Amended Complaint labels Count IV as "Tortious Interference with Contractual Relations" and complains of harm caused by canceled contracts, Am. Compl. ¶¶ 59–67, the Court evaluates Count IV as such.

orders would mean that Plaintiff would breach unspecified agreements with unidentified customers."); *Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008) ("[T]he Court finds inadequate the general claim of DenTek's knowledge of the contracts.").

Margolies also fails to allege the third element—intentional procurement of the breach. "[A] complaint must allege that the defendant *intended* to interfere with the plaintiff's business or contractual relations with another party." *B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010) (emphasis in original). To do so, the "defendant's interference must be direct: 'the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.'" *Id.* (quoting *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)). While Margolies alleges that Defendants "intended to disrupt the contractual relationships," (Am. Compl. ¶ 64), he does not allege that Defendants directed any activities towards his customers or clients or communicated directly in any way with them, and thus fails to satisfy this element.

V.     Injurious Falsehood

Injurious falsehood, "also referred to as 'trade libel,' 'product disparagement,' and other variations thereof, is a tort separate and distinct from the tort of defamation." *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 470 (S.D.N.Y. 2006). "Where a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed. Where, however, the statement is confined to denigrating the quality of the business' goods or services, it could support an action for disparagement, but will do so only if malice and special

damages are proven[.]" *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670–71 (1981).

"To recover for product disparagement under New York law, plaintiffs must show defendants' publication of a defamatory statement directed at the quality of their goods[.]" *Bilinski v. Keith Haring Found., Inc.*, 632 F. App'x 637, 641 (2d Cir. 2015); *Ruder & Finn*, 52 N.Y.2d at 670–71. Margolies alleges that his "personal and professional reputations were damaged" as a result of the Facebook Post. (Am. Compl. ¶ 74). But that is not an allegation that the Facebook Post attacked the qualities of his services as a producer or acting coach. And as such, he has not stated a claim for product disparagement or injurious falsehood. *Henneberry*, 415 F. Supp. 2d at 472 ("They do not speak to the quality of plaintiff's goods or services at all.").

The claim fails for other reasons. As noted, *supra* at 16–19, Margolies has not pled that Defendants acted with malice, which also requires this claim to be dismissed. *E.g.*, *Chao v. Mount Sinai Hosp.*, No. 10 CV 2869, 2010 WL 5222118, at *12 (S.D.N.Y. Dec. 17, 2010) (dismissing injurious falsehood claim where "[d]espite Plaintiff's allegation that the statements at issue 'were calculated to interfere with his employment with Mount Sinai/MSSM and to prevent others from employing him,' he has failed to show malice") (internal citation omitted), *aff'd*, 476 F. App'x 892, 897 (2d Cir. 2012); *see also Diario El Pais, S.L. v. The Nielsen Co.*, No. 07 CV 11295, 2008 WL 4833012, at *7 (S.D.N.Y. Nov. 6, 2008) ("Plaintiffs fail to state a claim for trade libel because their Amended Complaint does not allege facts that render 'plausible' the actual malice element of trade libel, let alone a set [of] facts that satisfy the heightened pleading requirements for actual malice.") (internal citation omitted). Separately, Margolies acknowledges his failure to plead special damages, (Opp'n at 14), namely, the "the loss

of something having economic or pecuniary value." *Bilinski*, 632 F. App'x at 641

(quotations omitted). Where loss of customers constitutes the alleged special damages,

"the individuals 'who ceased to be customers, or who refused to purchase,'" must be

named and "the exact damages" itemized. *Id.* (quoting *Fashion Boutique of Short Hills,*

*Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002)). Without pleading special

damages, this claim must be dismissed. *E.g.*, *N. Am. Olive Oil Ass'n v. D'Avolio Inc.*,

457 F. Supp. 3d 207, 231–32 (E.D.N.Y. 2020).

CONCLUSION

For the reasons explained above, all claims in the Amended Complaint are

dismissed. Margolies may file an amended complaint by **July 6, 2022** that addresses

the deficiencies identified herein.[44] Should he fail to file an amended complaint, the

Clerk of Court is directed to enter judgment dismissing the case with prejudice.

SO ORDERED.

*/s/ Sanket J. Bulsara*  6/6/2022
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York

---

[44] The Amended Complaint alleges both that Rudolph lives in Brooklyn, New York and Manhattan, New York. Am. Compl. ¶¶ 12, 16. This contradiction potentially places venue in the Southern District of New York. 28 U.S. Code § 1391(b)(1). Any future complaint should allege facts alleging venue in this District or the Court will transfer the case.