UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ROBERT MARGOLIES,

                           Plaintiff,

                                                      **MEMORANDUM &
                                                      ORDER**
            -against-                                 **21-CV-2447-SJB**

JEN RUDOLPH, a/k/a JENNIFER RUDOLPH and
THE ACTOR'S GREEN ROOM LLC,

                           Defendants.
-------------------------------------------------------------X
**BULSARA, United States Magistrate Judge:**

        This opinion resolves Robert Margolies's latest attempt to set forth a defamation

claim against Jen Rudolph following his removal from The Green Lounge, a Facebook

group she moderates, based on reports alleging that Margolies engaged in sexual

misconduct.  The Court previously dismissed Margolies's earlier complaint, which was

based on a June 2020 post on Facebook authored by Rudolph.  The Facebook Post

announced Margolies's removal from The Green Lounge and Rudolph's belief in

allegations about Margolies made by other members of the group.  Nowithstanding the

dismissal of the First Amended Complaint, the Court granted Margolies leave to file a

Second Amended Complaint addressing two deficiencies: a failure to allege that (1) any

statement made by the defendants was false; and (2) Rudolph acted with actual malice

in making any false statement.  Margolies's amended pleading, although curing the first

deficiency, still fails to allege actual malice.  His other claims also fail as a matter of law.

As such, the Court grants Defendants' motion and dismisses Margolies's claims with

prejudice.

<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

For the purposes of Defendants' motion to dismiss, the Court is "required to treat" the Second Amended Complaint's "factual allegations as true, drawing all reasonable inferences in favor of [Margolies] to the extent that the inferences are plausibly supported by allegations of fact." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021). The Court "therefore recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the court, as we have no way of knowing at this stage what are the true facts." *Id.*

The Court assumes familiarity with the facts and procedural history detailed in the undersigned's Memorandum and Order ("M&O") dated June 6, 2022. *Margolies v. Rudolph*, No. 21-CV-2447, 2022 WL 2062460, at \*1–\*2 (E.D.N.Y. June 6, 2022).

To summarize, the First Amended Complaint set forth five claims against Rudolph and The Actor's Green Room LLC ("AGR")[1]: (1) defamation *per se*, (First Am. Compl. dated May 10, 2021 ("First Am. Compl."), Dkt. No. 7 ¶¶ 34–46); (2) intentional infliction of emotional distress, (*id.* ¶¶ 47–52); (3) negligent infliction of emotional distress, (*id.* ¶¶ 53–58); (4) tortious interference with contractual relations, based on contracts Margolies claims that he had with two entities, (*id.* ¶¶ 59–67); and (5) injurious falsehood. (*Id.* ¶¶ 68–77). In the June 2022 M&O, the Court dismissed all of Margolies's claims without prejudice. *Margolies*, 2022 WL 2062460, at \*13.

The Court found that Margolies had established some of the elements of defamation but failed to plead falsity and actual malice. *Id.* at \*3–\*4. *First*, Margolies

---

[1] Although the defendant is The Actor's Green Room LLC, the Facebook group at issue is called The Green Lounge.

failed to plead falsity because he did not "identify which portion of the Facebook post is allegedly false, or why the statement is false." *Id.* at \*10. His allegations that the Facebook Post was "false" were conclusory and insufficient to survive a motion to dismiss. *Primiani v. Vintage 185 Inc.*, No. 18-CV-2237, 2019 WL 486087, at \*3 (E.D.N.Y. Feb. 6, 2019) (holding that "general allegations of falsity" without "any additional context or details" are merely "vague assertions" insufficient to plead falsity) (collecting cases). *Second*, to satisfy the degree of fault element, Margolies was required to plead actual malice under New York's anti-SLAPP ("Strategic Lawsuits Against Public Participation") statute. *Margolies*, 2022 WL 2062460, at \*6; *Id.* at \*6; *see* N.Y. Civ. Rights Law § 76-a(1)(a)(1)–(2). However, again the First Amended Complaint's allegations were entirely conclusory. *Margolies*, 2022 WL 2062460, at \*7–\*8.

Margolies's other claims were also dismissed. Among other faults, he failed to show that Defendants' statements were "extreme and outrageous" or that Defendants owed a duty to Margolies, flaws which defeated his claims for intentional and negligent infliction of emotional distress. *Id.* at \*11–\*12. Margolies's claim for tortious interference was dismissed because he failed to allege that Defendants knew of the contracts he claimed were interfered with. *Id.* at \*12. And the claim for injurious falsehood was dismissed because he failed to alleged that the "Facebook Post attacked the qualities of his services as a producer or acting coach." *Id.* at \*13.

The Second Amended Complaint contains additional allegations absent from his earlier pleading. Margolies alleges he met Rudolph in January 2018. (Second Am. Compl. dated July 6, 2022 ("Second Am. Compl."), Dkt. No. 30 ¶ 21). Rudolph proposed to Margolies that he teach classes at AGR and encouraged him to join The Green Lounge, which he did in January 2018. (*Id.* ¶¶ 23, 29–30). Beginning in March

2018, Margolies taught sold-out classes at AGR with most of his income coming from outside of class, including through helping aspiring actors with auditions and screenplays. (*Id.* ¶ 27). Margolies and Rudolph became friends, (*id.* ¶ 25), and Rudolph introduced and recommended him to other AGR members. (*Id.* ¶ 36). The two discussed upcoming projects, and Rudolph allegedly knew that Margolies had formed professional relationships with at least 100 members of The Green Lounge. (*Id.* ¶¶ 47, 50).

In October 2018, Rudolph approached Margolies about an accusation made by Courtney Therond ("Therond"), an assistant director who had been fired from a film Margolies produced. (Second Am. Compl. ¶¶ 37–38). Therond told Rudolph that Margolies had harassed the lead actress of the film. (*Id.* ¶ 39). Upon hearing Therond's account, Margolies "realized" that the accusation was based on a private conversation he had with a male friend about a different actress in the film. (*Id.* ¶ 41). According to Margolies, he asked his friend whether the actress "would be interested in having sexual relations with him." (*Id.*). Margolies believed that his friend told Therond about the conversation, and Therond proceeded to "distort[]" the truth and falsely told others that Margolies had harassed another actress, when he had not. (*Id.* ¶ 42). After explaining his version of events to Rudolph, Margolies said that "she believed him." (*Id.* ¶ 44). The two remained good friends afterwards. (Second Am. Compl. ¶ 45).

In October 2019, Margolies started teaching at competitors of AGR. (*Id.* ¶ 53). In response, Rudolph asked that Margolies pay her ten percent of any fee received from an AGR client—regardless of where he taught. (*Id.* ¶ 54). Margolies believes that he was the only AGR coach asked to pay a fee to Rudolph and that Rudolph was upset about AGR losing money. (*Id.* ¶¶ 55–57). The two became distant. (*Id.* ¶ 56).

On June 3, 2020, Rudolph posted a statement on The Green Lounge.  Rudolph wrote in part:

> Over the past week, several women have bravely come forward, putting themselves on the line, to report that members of this community – [REDACTED] and Rob Margolies – crossed the line and caused them harm. I believe these women.  I will always believe women and anyone who speaks up about sexual harassment, assault, and other abuses of power.  These men have both been permanently removed from this group and will no longer be permitted to participate in any AGR activities, classes, events, or meetups. I realize that this action, and this statement has come far too late.  For that and so much more, I am deeply sorry.

(Second Am. Compl. ¶ 60; Undated Facebook Post (the "Facebook Post"), attached as Ex. C to Second Am. Compl.).  In a subsequent conversation thread, Rudolph added that "[t]he second person I am aware of now has been removed."  (Undated Facebook Thread (the "Facebook Thread"), attached as Ex. D to Second Am. Compl., at 6; Second Am. Compl. ¶ 61).  Margolies alleges that this comment suggested that he "was also a perpetrator and/or predator who had engaged in inappropriate, sexual misconduct in the course of professional interactions . . . thus ostracizing [him] from his professional contacts and colleagues."  (Second Am. Compl. ¶ 61).

Margolies ties the Facebook Post to the Therond allegation—that is, he contends Rudolph based his removal from The Green Lounge on Therond's allegations.  Because Rudolph told Margolies that she believed him, Margolies alleges that Rudolph knew Therond's allegations were false or, at a minimum, had "serious doubts about the allegation."  (*Id.* ¶¶ 62, 72, 79).  Rudolph allegedly knew Therond was a "disgruntled former associate" and thus, "an unreliable witness."  (*Id.* ¶ 65).  Margolies suggests that Rudolph failed to conduct any further investigation and conveyed to members of The Green Lounge that Margolies had committed misconduct "despite the fact that no finding had been made."  (*Id.* ¶¶ 66–67).  Margolies believes that Rudolph made the

Facebook Post because she was upset that he was working outside of AGR and depriving the organization of revenue. (*Id.* ¶ 78).

The Second Amended Complaint contains two claims. Count I is for defamation *per se*. (*Id.* ¶¶ 80–98). Count II, for tortious interference with contractual relations, is based on contracts Margolies claims that he had with two entities, which Defendants knew of. (Second Am. Compl. ¶¶ 99–112). Margolies seeks actual and punitive damages and attorney's fees. (*Id.* Prayer for Relief at 17–18).

<u>DISCUSSION</u>

"The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of . . . claims for relief." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018) (citing *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)). In deciding such a motion, the Court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quotations and alteration omitted); *Amadei*, 348 F. Supp. 3d at 155 ("[W]hen reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of [the non-moving party].").

Once the facts are construed in the light most favorable to the non-moving party—here, Margolies—to avoid dismissal, there must be sufficient facts that allege a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (quotations omitted)). "[A] district court must limit itself to facts stated in the complaint or in

documents attached to the complaint as exhibits or incorporated in the complaint by reference. Of course, it may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. A complaint must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.* (quotations omitted). In other words, a plausible claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; Fed. R. Civ. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (internal citations omitted). The determination of whether a party has alleged a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Escamilla v. Young Shing Trading Co.*, No. 17-CV-652, 2018 WL 1521858, at *2 (E.D.N.Y. Jan. 8, 2018), *report and recommendation adopted*, 2018 WL 1033249, at *3 (Feb. 23, 2018).

I.   Defamation

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (quoting *Hogan v. Herald Co.*, 84 A.D.2d 470, 474 (4th Dep't 1982)). "Generally, spoken defamatory words are slander; written defamatory words are libel." *Id.* "Under New York law a defamation plaintiff must establish five elements: (1) a

written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin*, 940 F.3d at 809. "In addition, a public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is, made with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* (quotations omitted).

In the June 2022 M&O, the Court found that Margolies had established three of the elements but failed "to plead actual malice and falsity." *Margolies*, 2022 WL 2062460, at *4.

A. Falsity

"Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Nunes v. NBCUniversal Media, LLC*, No. 22-CV-1633, 2022 WL 17251981, at *5 (S.D.N.Y. Nov. 28, 2022) (quoting *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008)). "A 'pure opinion' is a statement of opinion which is accompanied by a recitation of the facts upon which it is based." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986). "When, however, the statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and is actionable." *Id.* (quotations omitted). "The actionable element of a 'mixed opinion' is not the false opinion itself—it is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking." *Id.* at 290; *see also Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) ("[Opinions statements] may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader.").

"The determination of whether a statement constitutes a pure opinion or a mixed opinion is a question of law for the Court, and one which must be answered by considering, 'in the context of the entire communication and of the circumstances in which they were spoken or written,' whether the average listener would 'reasonably underst[and] [the opinion] as implying the assertion of undisclosed facts justifying the opinion.'" *Cooper v. Templeton*, 629 F. Supp. 3d 223, 235–36 (S.D.N.Y. 2022) (quoting *Steinhilber*, 68 N.Y.2d at 290), *aff'd sub nom. Cooper v. Franklin Templeton Invs.*, No. 22-CV-2763, 2023 WL 3882977, at *5 (2d Cir. June 8, 2023); s*ee also McNamee v. Clemens*, 762 F. Supp. 2d 584, 601 (E.D.N.Y. 2011) (citing *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153 (1993)) (articulating the three-factor test for differentiating statements of protected opinions "from those asserting or implying actionable facts").

The Second Amended Complaint alleges that the following portions of the Facebook Post are false:

> [S]everal women have bravely come forward, putting themselves on the line, to report that members of this community – [REDACTED] and Rob Margolies – crossed the line and caused them harm. I believe these women. I will always believe women and anyone who speaks up about sexual harassment, assault, and other abuses of power. These men have both been permanently removed from this group and will no longer be permitted to participate in any AGR activities, classes, events, or meetups.

(Second Am. Compl. ¶ 82; Facebook Post).

In their original motion to dismiss, Defendants made a series of arguments why the Facebook Post was a non-actionable opinion. They contended that the Post was hyperbolic, impossible of being proven true or false, and imprecise, among other arguments. The Court rejected each of these arguments. And the Court also concluded that Margolies, though using the term "false" more than 25 times, never explained or

alleged what portion of the Facebook Post he alleged was false. *Margolies*, 2022 WL 2062460, at *10.

Now the Second Amended Complaint alleges that the Facebook Post is false because it accuses Margolies of sexual harassment and assault, and the statements are false because he, in fact, has never harassed and assaulted anyone. (Second Am. Compl. ¶¶ 83–84). Defendants argue that this is insufficient—Margolies must allege that Rudolph was not told by several women about alleged sexual impropriety. That is, Defendants contend that the Facebook Post does not say that Margolies harassed or assaulted others, but rather, that several women *reported to Rudolph* that Margolies had harassed or assaulted them, and Rudolph believed them. Defendants contend that to properly allege that the statement was false, Margolies would have to allege that several women did not in fact make allegations about him to Rudolph.

Such a narrow reading of the Facebook Post deprives it of any context. Because Rudolph relies on allegations conveyed to her, which she refers to but does not recount—suggesting that she has facts from others about Margolies and his improper conduct—the Facebook Post is an actionable "mixed opinion." *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977) ("Liability for libel may attach, however, when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader. If an author represents that he has private, first-hand knowledge which substantiates the opinions he expresses, the expression of opinion becomes as damaging as an assertion of fact."). And with a mixed opinion defamation case, to allege falsity, a plaintiff need

only allege that the underlying alleged misconduct did not take place.  *See Herlihy v. Metro. Museum of Art*, 214 A.D.2d 250, 259–60 (1st Dep't 1995).[2]

Furthermore, Rudolph states, "I believe these women," meaning that she believes that the allegations are in fact true.  That Rudolph passes along allegations originating from another does not render them incapable of conveying their underlying substance— that Margolies engaged in misconduct—or shield her from defamation liability.  "It is well settled that Defendants cannot escape liability simply because they are conveying someone else's defamatory statements without adopting those viewpoints as their own." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012); *accord Brian v. Richardson*, 87 N.Y.2d 46, 54 (1995) ("To be sure, the fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character."); *e.g.*, *Gross*, 82 N.Y.2d at 155 ("[I]f the statement 'John is a thief' is actionable when considered in its applicable context, the statement '*I believe* John is a thief' would be equally actionable when placed in precisely the same context.").

Margolies has therefore, by denying that he has ever harassed or assaulted anyone, adequately alleged that the Facebook Post's allegations are false.  Unlike the prior pleading, which only reflexively recited the word false and nothing more, this pleading contains the necessary allegation to render the alleged defamatory statement false.  *E.g.*, *Moraes v. White*, 571 F. Supp. 3d 77, 96 (S.D.N.Y. 2021) (finding complaint

---

[2] In neither their first motion nor this present one do Defendants argue that the Facebook Post is not a mixed opinion; they do not address the concept at all.  And they do not contend that the Facebook Post reveals not that Rudolph is relying on facts of others, but her own personal worldview: to always believe accusers.  (*See* The Facebook Post ("I believe these women.  I will always believe women and anyone who speaks up about sexual harassment, assault, and other abuses of power.")).

alleged falsity where defendant made Facebook post implying, based on undisclosed facts, that plaintiff was stalker and harasser worthy of arrest, and plaintiff denied engaging in any harassment or stalking behavior).

B.  Actual Malice

Despite properly alleging falsity, Margolies's defamation claim nonetheless fails. The Court previously held that Margolies's defamation claim falls within New York's anti-SLAPP statute because it is an action involving a communication "in a place open to the public or a public forum in connection with an issue of public interest." *Margolies*, 2022 WL 2062460, at *6 (quoting N.Y. Civ. Rights Law ¶ 76-a(1)(a)(1)–(2)). He has not challenged that finding, and Margolies concedes that the applicable degree of fault is actual malice. (Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss ("Pl.'s Mem."), Dkt. No. 33-2 at 5). Margolies, however, has again failed to plead that Rudolph acted with actual malice.

To satisfy the actual malice standard, Margolies must show that the statement at issue was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Palin*, 940 F.3d at 809 (quotations omitted). "Actual malice does not simply connote ill will or spite; rather it is 'a term of art denoting deliberate or reckless falsification.'" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 276 (S.D.N.Y. 2013) (quoting *Masson v. New Yorker Mag.*, 501 U.S. 496, 499 (1991)), *aff'd*, 807 F.3d 541, 547 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67, 70 (2d Cir. 2015). "In cases 'involving the reporting of a third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Id.* (emphasis omitted) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)).

Actual malice must be plausibly alleged. *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015). That is, there should be a sufficient basis "to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *BYD Co. v. VICE Media LLC*, No. 21-1097, 2022 WL 598973, at *2 (2d Cir. Mar. 1, 2022) (quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001)), *cert. denied*, 143 S. Ct. 103 (2022) (mem.). "Although actual malice is subjective, a court typically will infer actual malice from objective facts, understanding that a defendant in a defamation action will rarely admit that he published the relevant statements with actual malice." *Id.* (quotations omitted). As such, "whether actual malice can plausibly be inferred will depend on the facts and circumstances of each case." *Biro*, 807 F.3d at 545. However, "[a]ctual malice, even by way of recklessness, is . . . a difficult standard to meet." *Biro*, 963 F. Supp. 2d at 277.

Margolies argues that Rudolph knew that the statements in the Facebook Post were false because she had, two years before, concluded that the Therond allegations were false (when she told Margolies that she believed his version of events). (Second Am. Compl. ¶¶ 86, 89 ("Rudolph was aware that the allegation was made by a disgruntled former associate, Therond[.]")). Margolies assumes that Rudolph was referring to the Therond allegation when she made the Facebook Post—but there is no indication that the reason she made the Facebook Post was because of Therond or her account. Nothing in the Facebook Post mentions Therond, the timing of Therond's allegations, or any particular interaction related to Rudolph. And Margolies identifies nothing in the Facebook Post from which to make that inference.

In sum, there is nothing in the Facebook Post that suggests that Rudolph is referring to Therond's allegations, as opposed to allegations made by another. And it is

Margolies's burden to provide something—even with extrinsic evidence[3]—that allows the Court to draw the inference that the Facebook Post is referring to Therond and not some other set of allegations made by someone else.  Here, there is none.

Indeed, the only inference that can be drawn is that the Facebook Post is based on some other set of allegations or people.  For one thing, Margolies alleged that Rudolph approached him about Therond's allegations in October 2018, almost two years before the Facebook Post.  (Second Am. Compl. ¶ 37).  But the Facebook Post begins with the suggestion that Rudolph is relying on new reports recently received— "[o]*ver the past week*, several women have bravely come forward," (Facebook Post (emphasis added))—and not an old allegation.  For another, Margolies relies on Rudolph's subsequent comment on the Facebook Thread—that she "had no idea of what occurred with the second person that was just brought to my attention," (Facebook Thread at 6)—as evidence that Rudolph was acting with actual malice.  But the comment only undermines the inference that the Facebook Post was referring to the 2018 claim by Therond: Margolies repeatedly states he spoke with Rudolph about Therond, (*e.g.*, Second Am. Compl. ¶¶ 44, 62, 65); the comment suggests that Rudolph "had no idea" about the incident that led to Margolies's removal.  (Facebook Thread at 6).  As such, Margolies's Second Amended Complaint—which turns on the unfounded and unsupported assumption that Rudolph was talking about Therond's claims—fails to allege that Rudolph acted with actual malice.  *E.g.*, *Biro*, 963 F. Supp. 2d at 286–87 ("The Third Amended Complaint focuses on one source in particular, Theresa Franks,

---

[3] *Cf. Geisler v. Petrocelli*, 616 F.2d 636, 640 (2d Cir. 1980) ("It has long been the rule that extrinsic evidence is admissible to buttress the claim that the defamation is 'of and concerning' the plaintiff and the fact that resort to such evidence may be necessary does not defeat the claim.").

whom Biro claims to be one of the defendants' principal sources for the Article. However, there is no reason to believe—nor does the complaint allege—that Franks was a source for any of the four remaining defamatory passages.  Indeed, while Biro's opposition brief encourages the Court to find that Grann acted with actual malice by relying on Franks, it does not explain how Franks is in any way connected to the four passages in question. . . .  Therefore, Frank's reliability is irrelevant to Grann's alleged actual malice in writing the four allegedly defamatory passages at issue." (quotations and citations omitted)).

But even if the Facebook Post is understood to be about Therond's 2018 allegations about Margolies, there is still insufficient allegations that Rudolph acted with actual malice in repeating the claim in the Facebook Post.  "Actual malice can be established through the defendant's own actions or statements, the dubious nature of his sources, and the inherent improbability of the story among other circumstantial evidence." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) (quotations and alterations omitted).  The Second Amended Complaint fails to allege objective facts to enable the inference of Rudolph's acting with actual malice.  There is a constellation of a series of allegations that Margolies uses to suggest that Rudolph acted with actual malice: her previous belief in Margolies's version of events; her dissatisfaction with his taking business away from The Green Lounge; and her failure to investigate the allegations.  Either separately or in total, they do not amount to actual malice.

Margolies first contends that Rudolph acted with actual malice because she previously indicated that she believed Margolies's version of events—his statement that he did not act inappropriately in the way Therond suggested.  (Second Am. Compl.

¶ 62).  But that at one time Rudolph believed Margolies, but chose not to do so later, is not evidence that Rudolph knew the allegations about his conduct to be false.  A plaintiff "cannot establish actual malice on the basis that . . . [a] defendant[] declined to consider plaintiff['s] account of the events."  *Hodges v. Lutwin*, No. 22-974, 2023 WL 3362836, at *4 (2d Cir. May 11, 2023); *e.g.*, *Sanderson v. Bellevue Maternity Hosp. Inc.*, 259 A.D.2d 888, 890 (3d Dep't 1999) (finding failure to listen to plaintiff's explanation insufficient to establish actual malice).

Margolies then tries to infer actual malice because of Rudolph's dissatisfaction with Rudolph's taking business away from The Green Room.  (*See, e.g.*, Second Am. Compl. ¶ 56 ("Rudolph's attitude towards Plaintiff changed and she became distant. Plaintiff realized the reason was because his decision to give classes outside of AGR was costing AGR a substantial amount of money."); *id.* ¶ 78 ("[O]ne of the reasons why Rudolph knowingly or with reckless disregard for the truth made the defamatory statement is because she was upset at losing the revenue that was coming to AGR as a result of Plaintiff leaving and giving classes privately.")).  To be sure, "[e]vidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice."  *Celle*, 209 F.3d at 183.  But Margolies began soliciting clients and working outside of The Green Room—and his relationship with Rudolph deteriorated—months before the Facebook Post.  (Second Am. Compl. ¶ 53 ("In or around October of 2019, Plaintiff started giving classes privately at other locations besides AGR[.]"); *id.* ¶ 54 ("When Rudolph found out that he was giving additional classes outside of AGR, she was unhappy[.]"); *id.* ¶ 56 ("After this, Rudolph's attitude towards Plaintiff changed and she became distant.")).  And without anything more,

Margolies's allegations amount to nothing more that suggesting that Rudolph bore ill will; they do not provide non-speculative, non-conclusory reasons to infer that the Facebook Post was somehow connected to the parties' decaying relationship or Margolies's decision to take his business elsewhere.

Finally, Margolies contends Rudolph acted with reckless disregard for the truth by simply adopting Therond's accusations without further inquiry.  (Pl.'s Mem. at 6; Second Am. Compl. ¶ 87 (alleging Facebook Post was made "without any investigation or neutral determination as to whether [Margolies] had *actually* engaged in any impropriety." (emphasis in original))).  "[T]he operative question is whether a defendant failed to investigate in the face of actual, subjective doubts as to the accuracy of the story."  *Biro*, 963 F. Supp. 2d at 278 (quotations omitted); *see also Contemp. Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988) ("[A] finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing. . . .  Rather, a public figure defamation plaintiff must show either that the publisher actually entertained serious doubts about the veracity of the publication, or that there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (alterations in original) (quotations and emphasis omitted)).

All Margolies alleges is that Rudolph "knew that Therond was an unreliable witness," (Second Am. Compl. ¶ 89), because she had been fired from Margolies's film and thus had reasons to be disgruntled.  But this is simply a way of restating Margolies's version of events—it does not suggest that Rudolph had her own doubts about Therond's statements or credibility or that Therond's recitation was so obviously implausible. *Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*, 84 N.Y.2d 786, 793 (1995) ("Absent

some direct evidence that defendants in this case were aware that Mays' complaint was probably false, they cannot be found to have harbored an intent to avoid the truth."). And as such, there was no affirmative obligation for her to conduct her own investigation into Therond's claims before relaying them in the Facebook Post. *See, e.g.*, *BYD Co. v. Vice Media LLC*, 531 F. Supp. 3d 810, 826 (S.D.N.Y. 2021) ("[N]one of these allegations, even read with all inferences drawn in [plaintiff's] favor, plausibly establish that [defendant] recklessly disregarded the truth in reporting, as none come close to plausibly alleging that [defendant] was subjectively aware that the source was unreliable." (quotations omitted)), *aff'd*, No. 21-1097, 2022 WL 598973, at *4 (2d Cir. Mar. 1, 2022), *cert. denied*, 143 S. Ct. 103 (2022) (mem.).

At bottom, Margolies alleges that Rudolph acted with actual malice by adopting Therond's version of events over his, that she did so because of her prior upset at Margolies's business decisions and their effect on AGR, and that further inquiry would have revealed that Margolies had never done anything wrong, harassed anyone, or assaulted anyone. That conduct may be negligent, but it is not actual malice; that is, in total, that is insufficient to draw the inference that Rudolph made the Facebook Post "with knowledge that it was false or with reckless disregard of whether it was false not." *Behar*, 238 F.3d at 173–74 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).

Margolies has thus "failed to plead 'plausible grounds to infer actual malice by alleging enough facts to raise a reasonable expectation that discovery will reveal evidence of actual malice.'" *Jacob v. Lorenz*, No. 21-CV-6807, 2023 WL 4106298, at *11 (S.D.N.Y. June 21, 2023) (quoting *Biro*, 807 F.3d at 546). Although Margolies's Second Amended Complaint "cured the initial deficiency noted by the Court [in the M&O]—his

previous failure to adequately allege falsity—the additional factual allegations still fail to plausibly establish" actual malice. *Marom v. Pierot*, No. 18-CV-12094, 2020 WL 6572509, at *5 (S.D.N.Y. Aug. 30, 2020) (citation omitted), *report and recommendation adopted*, 2020 WL 6565199, at *2 (Nov. 9, 2020). This claim is, therefore, dismissed with prejudice.

## II.    Tortious Interference with Contractual Relations

"New York law considers claims sounding in tort to be defamation claims . . . where those causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by Plaintiff flows from the effect on his reputation." *Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (alterations in original) (quoting *Jain v. Sec. Indus. & Fin. Mkts. Ass'n*, No. 08-CV-6463, 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009)). "To successfully assert both a cause of action for defamation and tortious interference, a plaintiff must allege an independent source of the alleged harm." *Fahey v. Breakthrough Films & Television Inc.*, No. 21-CV-3208, 2022 WL 6244313, at *26 (S.D.N.Y. July 7, 2022) (quotations omitted), *report and recommendation adopted*, 2022 WL 4547438, at *1 (Sept. 29, 2022). "[A] tortious interference claim seeking economic damages derived entirely from defamatory statements is properly dismissed as duplicative of a defamation claim." *Potts v. Potts*, No. 19-CV-1403, 2021 WL 4440666, at *9 (N.D.N.Y. Sept. 27, 2021); *accord Goldman v. Barrett*, 733 F. App'x 568, 570 (2d Cir. 2018) (collecting cases). And "[c]ourts have found tortious interference claims duplicative even where the underlying defamation claim is not viable and has been dismissed." *White v. Pawelsky*, No. 19-CV-5246, 2021 WL 7908050, at *6 (E.D.N.Y. Mar. 14, 2021) (collecting cases), *report and recommendation adopted*, Order (Mar. 31, 2021); *e.g.*, *Chao*, 476 F. App'x at 895.

Margolies alleges that Rudolph's Facebook Post "branded [him] as a sexual predator" and "disrupted the contractual relationships between" Margolies and two named third parties. (Second Am. Compl. ¶¶ 107–08). This claim is "premised on identical underlying factual content" as his defamation claim, and he has not alleged "an independent source of harm." *Goldman*, 733 F. App'x at 571. Margolies's "tortious interference cause of action is indistinguishable from his defamation cause of action." *Ganske v. Mensch*, 480 F. Supp. 3d 542, 556 (S.D.N.Y. 2020) (quotations and alteration omitted). As a result, Margolies's tortious interference with contractual relations claim is duplicative of his defamation claim and must be dismissed.

Even if the claim was not duplicative, it still does not survive. To state a claim for tortious interference with contractual relations under New York law, a plaintiff must plead "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (quotations omitted). "It is clear that New York law emphasizes the requirement that a tortious interference with contract claimant establish that the defendant purposefully intended to cause a contract party to breach a particular contract." *Conte v. Emmons*, 895 F.3d 168, 172 (2d Cir. 2018). "[I]t is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third party's contract with the plaintiff; instead, the evidence must show that the defendant's objective was to procure such a breach." *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013) (citing *High Falls Brewing Co., LLC v. Bos. Beer Corp.*, 513 F. App'x 12, 13 (2d Cir. 2013)).

The Second Amended Complaint fails to satisfy the third element: that Rudolph intended to procure a breach of the contracts Margolies had with third-parties. Margolies argues that "the activity that [Rudolph] directed towards third parties which convinced them not to continue any work with the Plaintiff was to communicate directly with the members of the Green Lounge group (many of whom were Plaintiff's clients privately and at One on One NYC and Next Level Studios LA)." (Pl.'s Mem. at 9). But this is not an allegation that Rudolph intended to communicate directly with either One on One NYC or Next Level Studios LA or did so to upend any contractual relationships with Margolies. He also contends generally that "Defendants intended to disrupt the contractual relationships between [Margolies], other community members, One on One NYC and Next Level Studios LA." (Second Am. Compl. ¶ 109). This is just a conclusion in a veneer of legalese. "It is not enough for [Margolies] to merely state that [Rudolph] intentionally procured the breaches of contract[.]" *Harris v. Queens Cnty. Dist. Att'y's Off.*, No. 08-CV-1703, 2009 WL 3805457, at *11 (E.D.N.Y. Nov. 9, 2009) (quotations omitted). There are no facts alleged to draw an inference that the Facebook Post was created to influence One on One NYC or Next Level Studios LA with the objective to end their relationship with Margolies. *Cf. G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) ("[I]n order to prevail on this claim, the distributors would have to show that the appellees intentionally caused the retailers not to enter into a contractual relation with them. The distributors cannot allege such intentional interference, and their claim therefore fails." (citations omitted)). As such, this claim must be dismissed on this separate ground.

III. <u>Attorney's Fees and Costs Under N.Y. Civ. Rights Law § 70-a</u>

Defendants contend that are entitled to attorney's fees and costs under New York's anti-SLAPP law. (Defs.' Mem. of Law in Supp. of Reply ("Defs.' Reply"), Dkt. No. 33-4 at 8). New York Civil Rights Law § 70-a provides that prevailing defendants in a SLAPP suit shall recover attorney's fees and costs, unless the plaintiff demonstrates that the "cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law." *Kesner v. Buhl*, 590 F. Supp. 3d 680, 699–700 (S.D.N.Y. 2022) (quoting N.Y. Civ. Rights Law § 70-a), *aff'd sub. nom. Kesner v. Dow Jones & Co.*, No. 22-875, 2023 WL 4072929, at *4 (2d Cir. June 20, 2023).

"The Second Circuit has yet to squarely address" the issue of whether section 70-a applies in federal court. *Waite v. Gonzalez*, No. 21-CV-2506, 2023 WL 2742296 (E.D.N.Y. Mar. 31, 2023). Defendants assume without explaining that section 70-a applies in this case, notwithstanding much litigation within the Second Circuit on which provisions of the anti-SLAPP law apply in federal court. *Compare Kesner*, 590 F. Supp. 3d at 700–01 (declining to apply section 70-a in federal diversity actions), *and Prince v. Intercept*, 634 F. Supp. 3d 114, 142 (S.D.N.Y. 2022) (same), *with Harris v. Am. Acct. Ass'n*, No. 20-CV-1057, 2022 WL 1641606, at *5 (N.D.N.Y. May 24, 2022) (awarding attorney's fees under section 70-a in a federal diversity action), *overruled in part by* No. 22-811, 2023 WL 2803770, at *3 (2d Cir. Apr. 6, 2023).

That being said, "[e]ven assuming without deciding that the statute applies in a diversity suit in federal court," the Court concludes "that the standard set by the statute for an award of attorneys' fees and costs has not been met." *Harris v. Am. Acct. Ass'n*, No. 22-811, 2023 WL 2803770 (2d Cir. Apr. 6, 2023). Defendants' request is made in a

one-sentence conclusion, bereft of explanation, citation, or analysis.  (*See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Dkt. No. 33-1 at 1, 11; Defs.' Reply at 8).  And it ignores the necessary prerequisite for an award of fees under section 70-a: a showing that the plaintiff's cause of action lacks a "substantial basis" in law.  Here, the Court's dismissals were pursuant to Federal Rule 12(b)(6), a standard different from "substantial basis." *Kesner*, 590 F. Supp. 3d at 701 ("[The statute's] requirement that a claim lack[] 'a substantial basis in fact and law' . . . is distinct from . . . the Rule 12(b)(6) standard, which requires a plaintiff only to 'state a claim to relief that is plausible on its face.'").  The Court has made no finding that any of Margolies's claims lacked a "substantial basis" in law.  Defendants are, therefore, not entitled to fees or costs.

CONCLUSION

For the reasons explained above, both of Margolies's claims in the Second Amended Complaint are dismissed with prejudice.  A with-prejudice dismissal is appropriate because Margolies has already filed three complaints.  Under the circumstances, which include two amendments and two dismissals, the Court concludes that further amendments would be futile.  *See, e.g.*, *Cummings v. City of New York*, No. 19-CV-7723, 2021 WL 1163654, at *16 (S.D.N.Y. Mar. 26, 2021) (dismissing a defamation claim with prejudice after two dismissals), *aff'd*, No. 21-1380, 2022 WL 2166585, at *4 (2d Cir. June 16, 2022); *Marom*, 2020 WL 6572509, at *13 (same). Defendants' request for fees is also denied.  The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

*/s/Sanket J. Bulsara*

SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York
September 20, 2023